FILED
IN OPEN COURT

MAY 15 2014

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:14-CR-154-TSE |
| | ) | |
| v. | ) | |
| | ) | |
| LEA DZHIN, | ) | |
| | ) | |
| Defendant. | ) | |

STATEMENT OF FACTS

The United States of America and the defendant, LEA DZHIN, agree that, at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. INTEGRATED ACADEMICS is a company based in McLean, Virginia that specifically caters to international students and touts itself as offering a full range of services to students, including, securing college and university admissions, academic advising, and "tutoring" services. INTEGRATED ACADEMICS is owned by an individual with the initials "M.J.S." and is co-managed by M.J.S's sister LEA DZHIN.

2. MOHAMAD YOUSEF TELLAWI, has had a managing role at INTEGRATED ACADEMICS since 2011.

3. Pursuant to federal law, foreign nationals who wish to study in the United States must apply for an F-1 non-immigrant student visa. In order to receive an F-1 student visa, or maintain F-1 student status, a foreign national must, in relevant part, obtain a Student & Exchange Visitor Information System (SEVIS) Form I-20 Certificate of Eligibility for Nonimmigrant (F-1) Student Status from an authorized college or university. The Form I-20 is

an official government form issued by schools that have been approved by the Department of Homeland Security to accept international students.

4. By issuing a Form I-20, a school certifies that a foreign national will enroll full-time as a student, has satisfied all admission requirements, has been accepted for admission, and has proven sufficient financial support. Federal law mandates, in relevant part, that where the selected course of study requires proficiency in English, approved schools must obtain proof of a foreign national's English language proficiency prior to issuing a Form I-20. The proof can be based on a foreign national passing an English language proficiency assessment or providing a transcript showing successful completion of basic English language classes. Question 6 of the Form I-20 specifically requires the sponsoring school to list the English proficiency of the foreign national. After receiving an F-1 non-immigrant student visa, the foreign national student must stay enrolled in the university and otherwise comply with the visa in order to maintain a lawful immigration presence in the United States. If the foreign national student does not stay enrolled in the university or otherwise violates the terms and conditions of his F-1 non-immigrant student visa, the foreign national will be considered to be out of proper immigration status and will be subject to removal from the United States.

5. From in and around May, 2013 through in and around October, 2013, in the Eastern District of Virginia and elsewhere, LEA DZHIN did knowingly and unlawfully combine, conspire, confederate, and agree with others, known and unknown, to use, attempt to use, possess, obtain, and receive documents prescribed by statute and regulation as authorization to stay in the United States, knowing the documents to be falsely made, procured by means of a false claim and statement, and otherwise procured by fraud and unlawfully obtained in violation of Title 18, United States Code, Section 1546(a). In doing so, DZHIN, committed acts to effect

2

the object of the conspiracy, including the creation of at least 23 Strayer University fraudulent transcripts and other documents knowing that each transcript and document would be used in support of a Department of Homeland Security Form I-20, filed with the United States government, to show necessary prerequisites in order for foreign nationals to be eligible for or retain F-1 non-immigrant student visas and facilitating the foreign nationals continued presence in the United States on F-1 non-immigrant student visas through academic fraud.

6. During and in furtherance of the conspiracy, DZHIN did conspire with others to create fraudulent Strayer University unofficial transcripts in clients of INTEGRATED ACADEMICS names to make it appear that the clients had completed English-115, a basic English class offered by Strayer University, which satisfied the English proficiency requirement in question 6 of the Form I-20. Seven fraudulent unofficial transcripts were found as Microsoft Word documents on DZHIN's computer, and one fraudulent unofficial transcript was found on M.J.S.'s computer. The fraudulent transcripts were then included as evidence of the English language proficiency requirement in the I-20 application packages filed with the universities. English proficiency is a necessary prerequisite to certain courses of study, including the courses of study being pursued by clients of INTEGRATED ACADEMICS, and thus is a material factor considered by admissions officers prior to issuing an I-20.

7. During the course of the conspiracy, DZHIN learned that TELLAWI and MAHER OSAMA KHUDARI, who was an admissions official at Strayer University, were causing to have fraudulent official Strayer University transcripts created to make it appear as if clients of INTEGRATED ACADEMICS had satisfactorily completed the English-115 course. As an admissions official, KHUDARI had access to Strayer University's database containing, among other things, student biographical information and academic records. KHUDARI would access

Strayer University's database and change an actual student's name to reflect the name of the client of INTEGRATED ACADEMICS. Once the records were fraudulently modified, KHUDARI would request that official and/or unofficial copies of the fraudulent transcripts be mailed to a variety of addresses including the business address of INTEGRATED ACADEMICS in McLean, Virginia, TELLAWI and DZHIN's shared residential address in Falls Church, Virginia, and TELLAWI's mother's address in Glen Burnie, Maryland. TELLAWI would, in turn, file these transcripts with the Form I-20 to falsely demonstrate that the foreign national student met the basic English proficiency requirement.

8. During and in furtherance of the conspiracy TELLAWI would personally deliver the fraudulent I-20 application packages which contained the altered Strayer University transcripts, to the schools issuing the I-20s, and would meet with the school officials on behalf of clients of INTEGRATED ACADEMICS. Further, on at least one occasion, DZHIN met with university police, who were investigating the validity of an I-20 application which contained a fraudulent transcript, filed on behalf of an INTEGRATED ACADEMICS client. TELLAWI would also, at times, list the business address for INTEGRATED ACADEMICS and his residential address that he shares with DZHIN, as well as TELLAWI's email address, as the point of contact on the Form I-20 as well as on the university's I-20 processing paperwork.

9. During and in furtherance of the conspiracy, TELLAWI and, on at least one occasion, DZHIN sent KHUDARI text messages requesting transcripts for clients of INTEGRATED ACADEMICS. In these requests, TELLAWI and DZHIN would notify KHUDARI of the clients' names, dates of birth, and in what classes the clients need to be enrolled. KHUDARI, in turn, would alter the transcripts to include the requested information.

10. In return for KHUDARI's services, TELLAWI provided several envelopes containing

United States dollars to KHUDARI. Additionally, during the course of the conspiracy, DZHIN provided KHUDARI with multiple checks from the business account for INTEGRATED ACADEMICS.

11. During and in furtherance of the conspiracy, TELLAWI, DZHIN, and M.J.S. would facilitate clients of INTEGRATED ACADEMICS continued presence as F-1 non-immigrant student visa holders in the United States by providing "tutoring" services for the clients. These "tutoring" services included hiring individuals to take online classes, write papers, and take tests on behalf of clients of INTEGRATED ACADEMICS. Often times, the students would just provide TELLAWI, DZHIN, and M.J.S. with their student identification number and password and not even be present when these "tutors" were providing these services. At times, students paid INTEGRATED ACADEMICS in cash for these services.

12. INTEGRATED ACADEMICS maintains its books and records with an online system known as Intuit QuickBooks (hereinafter, "QuickBooks"). Online access to QuickBooks for INTEGRATED ACADEMICS is password protected and is accessible by individuals, including, TELLAWI, DZHIN, and M.J.S. For the period in and around November, 2012 through in or around September, 2013, QuickBooks for INTEGRATED ACADEMICS shows recorded gross receipts of approximately $2,377,646.00.

13. During the course of the conspiracy, an undercover officer ("UC") posing as an international student on an F-1 non-immigrant student visa spoke with TELLAWI, DZHIN, and M.J.S. and requested their assistance in maintaining his F-1 non-immigrant student visa. Specifically, during the course of the conspiracy, after speaking with TELLAWI on the telephone, the UC met with DZHIN at INTEGRATED ACADEMICS and explained that he wanted to hire INTEGRATED ACADEMICS to complete assignments and take tests for him in

5

order to maintain his F-1 non-immigrant student visa. During the meeting, the UC explained to DZHIN that he was an F-1 non-immigrant student who was also working and being paid "under the table" and he didn't have time to both work and take his classes. DZHIN accessed the UC's student account and noted that the tests for one of the UC's classes were in-class exams. DZHIN specifically instructed the UC to take pictures of tests while taking the test in class and send it to her and she will provide him with the answers. DZHIN further printed out the tests and assignments that were past due and instructed the UC to come back to INTEGRATED ACADEMICS the next day to pick up the completed test and assignments. The next day, the UC returned to INTEGRATED ACADEMICS and, this time, met with M.J.S., who accessed QuickBooks and provided the UC with an invoice from QuickBooks and took a $200.00 deposit consisting of marked bills from the UC. M.J.S. told the UC that he would email the UC the paperwork. Later that day, M.J.S. called the UC and advised him that DZHIN was back in the office and asked the UC to return to INTEGRATED ACADEMICS. When the UC returned to INTEGRATED ACADEMICS he met with TELLAWI, DZHIN, and M.J.S. During this meeting, the UC explained that he wanted INTEGRATED ACADEMICS to take all of his tests for him and agreed to pay INTEGRATED ACADEMICS $6,000.00 for doing so. Prior to leaving that day, the UC handed DZHIN the remaining balance of $5,800.00 in marked bills. During a search of TELLAWI and DZHIN's shared residence the $6,000.00 in marked bills, consisting of both the $200.00 provided to M.J.S. and the $5,800.00 provided to DZHIN, were recovered.

14. Many of the clients of INTEGRATED ACADEMICS who received these fraudulent transcripts also received "tutoring" services from INTEGRATED ACADEMICS. These "tutoring" services included writing papers and taking tests on behalf of the clients. This service

was provided in order for the clients of INTEGRATED ACADEMICS to maintain in current status with the universities that sponsored the I-20s and, therefore, not be in jeopardy of losing the F-1 nonimmigrant student visa. According to QuickBooks, INTEGRATED ACADEMICS billed these clients' approximately $265,000.00 for its services in both securing admissions and tutoring services.

15. During the course of the conspiracy, INTEGRATED ACADEMICS used proceeds from this immigration document fraud conspiracy to purchase a 2010 Mercedes-Benz E350 Sedan which was driven by TELLAWI when he brought the admission packages with the fraudulent Strayer University transcripts to the universities. This 2010 Mercedes-Benz E350 Sedan is registered to M.J.S.

16. INTEGRATED ACADEMICS has not filed federal income tax returns with the Internal Revenue Service since its creation in 2011. DZHIN has also not filed federal income tax returns with the Internal Revenue Service since 2010.

17. The acts taken by DZHIN in furtherance of the offense charged in this case, including the acts described above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

18. This Statement of Facts includes those facts necessary to support the Plea Agreement between the defendant DZHIN, and the government. It does not include each and every fact known to the defendant or to the government, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

Respectfully submitted,

Dana J. Boente
United States Attorney

By: *C. Alexandria Bogle*
C. Alexandria Bogle (LT)
Special Assistant United States Attorney

Date: 5/15/14

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proven the same beyond a reasonable doubt.

_____
Lea Dzhin
Defendant

I am the defendant's attorney. I have carefully reviewed the above Statement of Facts with the defendant. To my knowledge, the defendant's decision to stipulate to these facts is an informed and voluntary one.

_____
Marina Medvin
Counsel for Lea Dzhin