IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CRIMINAL ACTION |
| | ) |
| LEA DZHIN, | ) 1:14-cr-154 |
| | ) |
| Defendant. | ) |
| | ) |

REPORTER'S TRANSCRIPT

<u>SENTENCING HEARING</u>

Friday, August 8, 2014

---

<u>BEFORE</u>:  THE HONORABLE T.S. ELLIS, III
Presiding

<u>APPEARANCES</u>:  CHRISTINE BOGLE, AUSA
United States Attorney's Office
2100 Jamieson Ave.
Alexandria, VA 22314

For the Government

MARINA MEDVIN, ESQ.
Law Office of Marina Medvin, Esq.
1800 Diagonal Road, Suite 600
Alexandria, VA  22314

For the Defendant

---

MICHAEL A. RODRIQUEZ, RPR/CM/RMR
Official Court Reporter
USDC, Eastern District of Virginia
Alexandria, Virginia

THE CLERK:  United States vs. Lea Dzhin, Criminal Case No. 1:14-CR-154.

Counsel, please note your appearance for the record.

ATTORNEY BOGLE:  Good morning, your Honor.

Alex Bogle on behalf of the United States.

THE COURT:  All right.  Good morning, Ms. Bogle.

ATTORNEY MEDVIN:  Good morning, your Honor.

Marina Medvin on behalf of Ms. Dzhin.

THE COURT:  Good morning to you.

And good morning, Ms. Dzhin.

THE DEFENDANT:  Good morning.

THE COURT:  How -- help me pronounce your name correctly.

THE DEFENDANT:  Dzhin.

THE COURT:  Dzhin.

All right.  Good morning.  You may be seated.

This matter is before the Court for sentencing, this defendant having been found guilty on the basis of a plea of having engaged in a conspiracy to commit immigration document fraud.

The record shows that Ms. Dzhin and others engaged in a conspiracy to commit document immigration

fraud.  In essence, Ms. Dzhin and her -- I guess the word would be significant other.

Would that be correct?

ATTORNEY BOGLE:  I believe so, your Honor.

ATTORNEY MEDVIN:  Her boyfriend at the time, your Honor.

THE COURT:  Boyfriend is fine.

All right.  Ms. Dzhin and her boyfriend Tellawi and one other individual engaged in a conspiracy whereby clients of Integrated Academics, which was the company that Ms. Dzhin and Tellawi operated, provided service to individuals who wanted to remain in the United States under an F-1 non-immigrant student visa holder or to get such a visa.  And to do that, they had to show English proficiency.  And what they did with their co-conspirator is to obtain fake transcripts from --

What was the name of the institution?

ATTORNEY BOGLE:  Strayer University.

THE COURT:  -- Strayer University for purposes of applying for this visa.

There are also some other aspects of it. Ms. Dzhin also was involved in providing services to some of these individuals by actually having tutors or people take exams for them where they weren't really

taking them themselves.

Let me inquire, first of all, Ms. Medvin, have you had an adequate opportunity to review the presentence report and to review it with your client?

ATTORNEY MEDVIN:  Yes, your Honor, we did.

THE COURT:  Ms. Dzhin, have you had an adequate opportunity to review the presentence report and to review it with your counsel, Ms. Medvin?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And are you fully satisfied with the advice and counsel she's provided to you in this case?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Thank you.  You may be seated.

Now, I understand there is an objection to the probation officer's failure to award the defendant a two-level reduction for minor participant.

Is that still an objection?

ATTORNEY MEDVIN:  That is, your Honor.  It is a joint objection with the government.

ATTORNEY BOGLE:  That is accurate, your Honor.

THE COURT:  All right.  And are there any other objections?

ATTORNEY MEDVIN:  Your Honor, the secondary

objection that we made was as to the consideration of
her -- my apologies, your Honor.  The subsequent
objection that we made in our submissions was the
characterizations of her pending criminal charges in the
other jurisdictions and whether that should be
considered in enhancing the penalties.

It does not appear that she specifically
deferred to these pending criminal charges.  But
nonetheless, we wanted for the Court to be aware that we
don't believe they should be considered in determining
my client's penalties.

THE COURT:  And what were they?

ATTORNEY MEDVIN:  They were drug charges;
one of which is about to be dismissed, and the other one
which is in a state of exculpatory discovery at this
point, your Honor.

THE COURT:  Well, as you correctly point
out, the probation officer did not use any of that in
the calculation of the guidelines, but the probation
officer appropriately, properly acknowledged that those
charges existed.

ATTORNEY MEDVIN:  Yes, your Honor.

THE COURT:  And I don't find that they're
material to my sentencing decision, but they need to be
in the presentence investigation report.  I don't --

they're not material.  Your representation that one of

them is about to be dismissed is -- I don't accept it or

reject that.  It's not material to me.  I don't know

whether that's accurate, and I don't care.

ATTORNEY MEDVIN:  Yes, your Honor.  Thank

you.

THE COURT:  All right.  Now, any other

objections?

ATTORNEY BOGLE:  Not from the government.

THE COURT:  Let me be clear, Ms. Medvin,

when I say I don't know whether that's accurate.  What I

mean is I don't doubt that you believe that it will be

dismissed.  What I'm saying is we don't know.  But I

also said, in effect, we don't -- I don't care because

it isn't material to the Court's sentencing decision.

ATTORNEY MEDVIN:  Thank you, your Honor.

THE COURT:  All right.  Now, let me hear

first from you, Ms. Medvin, on why you think -- I have

your memorandum, and I've read that.

This is a conspiracy really of three people,

isn't it?

ATTORNEY MEDVIN:  Yes, your Honor.

THE COURT:  Khudari, Dzhin, and Tellawi.

ATTORNEY MEDVIN:  Yes, your Honor.

THE COURT:  And the guidelines say that

anyone who's -- you get two levels of credit as a minor participant if you're substantially less culpable than the average participant. In a three-person conspiracy, it's hard to see what's average.

Clearly, Mr. Tellawi was the organizer and the leader. He certainly played a bigger role than Ms. Dzhin, with whom he lived. However, Ms. Dzhin certainly knew all about it and she certainly participated.

Mr. Khudari played an important role because he was at Strayer. But I have a hard time seeing why anybody is -- in this conspiracy is substantially less culpable than anyone else other than Tellawi being more culpable. That's true. But that doesn't mean that everyone else other than Tellawi is a minor participant.

Can you tell why you think there's a minor participant?

ATTORNEY MEDVIN: Yes, your Honor.

In our opinion, just based on how the conspiracy was set up -- and it is a small conspiracy. Your Honor is right about that. The conspiracy was initiated by Mr. Tellawi and Mr. Khudari, who met and decided that this was a good way for them to make some money.

There's a need, basically, for students who

didn't want to participate in these boring classes, who wanted to take them quickly.  Mr. Khudari basically advised Mr. Tellawi at some point --

THE COURT:  Or who didn't want to take them.

ATTORNEY MEDVIN:  Or did not want to the take them, yes, your Honor.

THE COURT:  Right.  And because the fraud here was that there was a representation that they did take them when, in fact, they didn't.

ATTORNEY MEDVIN:  Yes, your Honor.

What's interesting, actually, as a side note, is those students were taking more complex classes at the time.  So they weren't simply just not taking classes.  They actually were taking other classes that were more interesting and more stimulating to them.  So they weren't running around a particular --

THE COURT:  That doesn't change the fraud.

ATTORNEY MEDVIN:  It doesn't change the fraud, your Honor, but it does kind of shed a light on who these kids were.  They are still students at the university.

THE COURT:  They're not before the Court.

ATTORNEY MEDVIN:  They're not before the Court, your Honor.  But Mr. Tellawi and Mr. Khudari --

THE COURT:  If they were, they would be

significantly chastised and punished for what they did,
because they participated in a fraud.  And it doesn't
matter that they didn't want to waste the time taking
what they thought they didn't need to take so they could
take other things.  That's not the point.

Go ahead.  Continue.

ATTORNEY MEDVIN:  Mr. Tellawi and
Mr. Khudari basically had a business relationship where
they realized they could make some money off of these
students who did not want to take these classes, for
whatever reasons.  And based on this relationship,
Mr. Khudari at some point advised Mr. Tellawi that he's
got an easy way to attain this goal, which is changing
transcripts.

Mr. Tellawi decided this was a great way for
him to make money, and the two of them were working
together on this.  Mr. Tellawi was working with
Ms. Dzhin in a business owned by Ms. Dzhin's brother.

And at that time, Mr. Tellawi's job was to
bring student clients into this tutoring business.  They
would tutor college students and provide other services
to them.  They were all academic in nature.  Whether
these were the best services to provide or not --

THE COURT:  In fact, some of the tutors that
your client made arrangements for were, in fact, taking

tests for these people.  That's a fraud, too.

It's not the fraud she pled guilty to, but it's a fraud, isn't it?

ATTORNEY MEDVIN:  I think it's arguable as to the nature of sad fraud, but we'll digress and go back to the issue at hand, your Honor, if we may.

THE COURT:  All right.

ATTORNEY MEDVIN:  Mr. Khudari -- I'm sorry -- Mr. Tellawi's purpose was to bring student customers in to this business, and he would go around to the campuses and he would recruit and he would bring customers in to the business.

Ms. Dzhin's role in the business was to manage the students at the time.  She would also issue checks at that time.

Basically, as the relationship between Mr. Khudari and Mr. Tellawi progressed and they started -- initially, actually, Mr. Khudari was just sending referrals to Mr. Tellawi's business, and he would get a referral fee for any students he referred.

Mr. Khudari was an admissions official at Strayer University.  He was in a position of power, a position of trust.  And he had access to these transcripts, and he had access to students, and he was somebody that people respected at the university.

Mr. Khudari, in our opinion, had committed the greater violation in the sense that he was the only individual who had the power to alter these transcripts. He was the one who provided this concept to begin with to Mr. Tellawi.  Mr. Tellawi simply capitalized on an idea he saw later.  And Ms. Dzhin was just working at the business.

Eventually, Ms. Dzhin was made aware of what was going on.  And Ms. Dzhin didn't make objections, and she continued to issue checks to Mr. Khudari, who was at that time altering transcripts for the students in addition to a variety of other services they were providing to them.

Initially, Ms. Dzhin was making checks to him for his referral fees.  And that, of course, changed, that relationship, later.

THE COURT:  And she knew what Khudari was doing.

ATTORNEY MEDVIN:  Towards the end, yes.  She wasn't involved initially --

THE COURT:  What was found on her computer?

ATTORNEY MEDVIN:  All of that, your Honor, initially -- she eventually learned about everything that are was going on, yes, your Honor.  But in terms of her direct participation, the main participation was

writing the checks.  That was the main participation.

In terms of recruiting the students, dealing with the students, that was to an extremely minor extent.  That was only when Mr. Tellawi couldn't do something, he'd request a favor from her.

This wasn't part of her job description, and this was just something she became aware of based on him living with her and realizing he's bringing this to her house eventually.  She didn't even realize he was bringing this to her house initially.

Mr. Tellawi resided with her only spontaneously.  He actually would reside with his mother in Maryland and would come to visit her because they ended up in a romantic relationship at some point.  So he wasn't actually even living with her continuously.

Based on her personal involvement in this, your Honor, I do believe it is minor in nature.  It is not a minimal role, but at the same time she's not controlling, she's not making any decisions, she's not creating transcripts, she's not bringing new students, she's not recruiting new students, she's not dealing with the students directly until after they've been brought in by Mr. Tellawi.

And even at that point, she's dealing with them on a different level.  Because they weren't just

requesting these transcripts.  They were requesting a variety of services for the classes they were taking as well that they needed assistance with.  It was a full-service business in that sense.  This was just one of the --

THE COURT:  The fact that she was doing other things which were not illegal doesn't mean that her participation in the conspiracy was minor.  I understand she was doing other things.

ATTORNEY MEDVIN:  I'm sorry, your Honor?

THE COURT:  You just argued that she was doing other things that were legitimate.

ATTORNEY MEDVIN:  Yes, your Honor.

THE COURT:  I'm pointing out that that doesn't really focus on whether what she actually did was minor in the conspiracy.  I'm sure she did many things that were legitimate; going to the grocery store, going to the bank, whatever.  But that does not -- isn't a sharp enough focus of what she actually did in the context of the conspiracy.

ATTORNEY MEDVIN:  I understand, your Honor. I'm trying to show that this wasn't part of her daily activities whereas Mr. Khudari in the conspiracy would be continuously altering transcripts and did that with numerous quantity of students.

What I'm trying to point out is --

THE COURT:  He then received these altered transcripts.

ATTORNEY MEDVIN:  I'm sorry, your Honor?

THE COURT:  She then received the altered transcripts.

ATTORNEY MEDVIN:  I believe it was actually Mr. Tellawi who received the altered transcripts.

THE COURT:  And what did she do with the altered transcripts?

ATTORNEY MEDVIN:  I don't believe she received them personally, your Honor.  If I may confer with my client.

THE COURT:  Well, there were a number of them found on her computer.

ATTORNEY MEDVIN:  It was a shared computer in her house that Mr. Tellawi also had access to, your Honor.  The issues with the computer --

THE COURT:  Well, if she didn't know anything about it, why did she plead guilty?

ATTORNEY MEDVIN:  No, your Honor, we're not saying she didn't know about it.  We're saying she wasn't controlling the --

THE COURT:  Of course she knew about it because I took the guilty plea, and she swore to the

statement of facts when I asked her what she did.

All right.  Go on, finish.

ATTORNEY MEDVIN:  We're making a statement
as to she wasn't utilized in those transcripts.  She
wasn't putting them into packets, sending them out or --
she wasn't utilizing those transcripts in the way that
the other two gentlemen in the conspiracy were.

THE COURT:  She wasn't utilizing?

ATTORNEY MEDVIN:  The transcripts were being
used and filed, sent to the students.  And then they
were being prepared as packages for them to file with
the schools.  She wasn't --

THE COURT:  Mr. Tellawi did all of that?

ATTORNEY MEDVIN:  I believe that is the
case, your Honor.

THE COURT:  All right.

ATTORNEY MEDVIN:  My client's role in the
conspiracy was minor compared to the conduct of the
other two individuals.  One organized and recruited
students.  The other one actually altered the
transcripts.  Then Mr. Tellawi went back and assisted
the students with what they did with the transcripts.

Ms. Dzhin's main role was she continued
writing checks from Integrated Academics.  That was her
main role in the conspiracy.  That was what she did.

And she was doing that initially without realizing to what extent the business relationship with Mr. Khudari extended.

THE COURT: Ms. Medvin --

ATTORNEY MEDVIN: Yes, your Honor.

THE COURT: -- there's at least one occasion where your client personally requested a fraudulent transcript from Khudari in support of obtaining fraudulent benefits, immigration benefits.

ATTORNEY MEDVIN: She sent a text message to Mr. Khudari, that is correct, with the name of the student that needed the service. She didn't specifically say exactly what they needed, but she did make that request.

THE COURT: Of course she knew that's what she was asking for, was a fraudulent transcript. Otherwise, she shouldn't have pled guilty.

ATTORNEY MEDVIN: Your Honor, we're not denying that -- what she did or didn't know. We're just stating that she wasn't --

THE COURT: She wasn't as culpable as Tellawi.

ATTORNEY MEDVIN: Yes, your Honor. That's all we're saying, is that her culpability was much less. That is all we're stating. We're not saying she's not

guilty or she didn't know.

THE COURT:  But an average participant is always less culpable than an organizer or manager.

ATTORNEY MEDVIN:  Yes, your Honor.

THE COURT:  That's why one gets the added -- all right.  Let me hear from the government.  What I want to hear from you is what exactly she did.

ATTORNEY BOGLE:  Yes, your Honor.

Your Honor, the evidence shows that the vast majority of the time, it was the defendants Mr. Tellawi and Mr. Khudari who were engaged in a relationship requesting and obtaining these transcripts.

However, on at least one occasion --

THE COURT:  Now, during that time, she was still a member of the conspiracy.

ATTORNEY BOGLE:  Your Honor, she -- the evidence suggests that she certainly became a member of the conspiracy as of May of 2012 -- I'm sorry -- May of 2013, your Honor, as evidenced by the transcripts that were found on Ms. Dzhin's computer.

However, it was in August of 2013 that she actually affirmatively made the request for the transcript, your Honor.

Nonetheless, your Honor, the defendant pled guilty to a conspiracy to commit immigration fraud and

specifically with obtaining and receiving these fraudulent documents that were used in support of immigration benefits.

During the course of the conspiracy of the defendant's involvement, the government had identified 23 fraudulent transcripts that were used in support of these immigration benefits, although we only had evidence that the defendant herself personally requested one of them.

She was appropriately held responsible for all 23. However, because of her limited role in obtaining and receiving these documents, we do believe a minor role adjustment is applicable here.

THE COURT: And you put that in the plea agreement?

ATTORNEY BOGLE: I did, your Honor.

THE COURT: All right. I'll consider this matter.

Let me see -- any other objections to the presentence report other than that, Ms. Medvin?

ATTORNEY MEDVIN: The main objection, of course, when it comes to --

THE COURT: Any other objections other than the minor role?

ATTORNEY MEDVIN: Just that she should be

receiving a sentence below the guidelines, your Honor.

THE COURT:  Yes, I'll give you an opportunity to allocute.  My question is are there any other --

ATTORNEY MEDVIN:  No.

THE COURT:  -- objections to the presentence report.

ATTORNEY MEDVIN:  No, your Honor.

THE COURT:  All right.  Now, let's proceed to hear allocution, if she wishes, by Ms. Dzhin.

Ms. Dzhin, you now have an opportunity to address the Court and to say anything at all you wish to the Court by way of extenuation or mitigation.  You don't have to say anything if you don't wish to, but you do have the opportunity.  And, of course, your counsel does, too.  And Ms. Medvin, you may either go first or after your client, whichever you'd prefer.

ATTORNEY MEDVIN:  Your Honor, I will let my client make a statement, if she wishes, and I will speak after.

THE COURT:  All right.

THE DEFENDANT:  Your Honor, I'd like to apologize to the Court, to the government, to my family for the time that's wasted and for my ignorance in this case.

THE COURT:  For your what?

THE DEFENDANT:  My ignorance as far as my neglect to notice this conspiracy going on earlier.

THE COURT:  I don't -- your participation was not a matter of ignorance.  You made a choice.  I tell all defendants, Ms. Dzhin, life consists of your making choices and then living with the consequences of the choices you make.  You don't determine where you're born, to whom you're born, or whether you're born with handicaps or talents, but you determine how you respond to all of that.

You made decisions about participating in this conspiracy, and they weren't as a result of ignorance.  What were they the result of?  They were the result of your not having made a definite choice in your life that you were going to be an honest person.

Because what you were doing was certainly not honest, was it?

THE DEFENDANT:  No.

THE COURT:  And you need to make that decision for the rest of your life.

Do you want to be an honest person?

THE DEFENDANT:  Yes, I do.

THE COURT:  And who is the only personal who can decide that you can be an honest person, Lea Dzhin

can be an honest person?  Who's the only person?

        THE DEFENDANT:  I am the only one.  Myself.

        THE COURT:  You need to make that decision.

        All right.  You may finish your statement.

        THE DEFENDANT:  I would just like to apologize for everything.

        THE COURT:  All right.  You may be seated.

        All right.  Ms. Medvin, I'll hear from you.
I have your brief, and I've reviewed that.

        ATTORNEY MEDVIN:  Thank you, your Honor.

        Just to summarize.  These are arguments
and statements we have already made in our brief.
Ms. Dzhin is 37 years old.  She is single.  She lives at
home with her dog.  Her brother is her best friend, and
her brother is the individual who owns the business.

        Ms. Dzhin eventually stopped the conspiracy
because she wanted to preserve her brother's business
reputation, and she was concerned about what was
happening; that it would eventually harm his business
reputation.

        THE COURT:  That's not a good reason to stop
it.

        ATTORNEY MEDVIN:  But that was the reason.

        THE COURT:  The reason to stop is that it
was wrong.  It was dishonest.

ATTORNEY MEDVIN:  It was wrong.  And that's -- but realizing that it was wrong and that it would hurt his business is why she did stop it, your Honor.  And she was successful in doing that.  Same goes for Mr. Tellawi when she requested that he stop.

THE COURT:  Well, would she have stopped it if helped his business?  The point I want you to focus on is it doesn't matter whether it would help or hurt the business.  It matters whether it is lawful and honest or unlawful and dishonest.

ATTORNEY MEDVIN:  Yes, your Honor.  It was all part of her way of making amends.

And, in fact, one of the things that she did on her own as someone who was in control of the funds that did come in to the business is she actually provided a refund to all the students -- or the ones that she knew of who paid for services.

Some of them paid just for the transcripts and additional services.  She refunded all of their monies to them, anyone who paid -- anyone who requested a fraudulent transcript, even if they requested other services and paid for other services as well, she refunded all of their monies to them.

So she wanted to disassociate from them as much as possible.  She wanted to make amends and move on

in a clean direction away from what was happening in the past.  She did all that on her own.

In my opinion, that shows her ability to realize that what was happening was wrong and this is the right way to go forward in both a business sense and the sense of right and wrong.  She did that on her own, your Honor.

And her leadership in the sense of disassociating from those individuals is what helped to cease the conspiracy with Mr. Tellawi interacting with those individuals as well.

My client is in a relationship or -- I guess what we'd call an on-and-off relationship with Mr. Tellawi, and she has been trying to improve his character as well.

She is divorced, but she does not have children from the prior marriage or from any relationship.  She wasn't born in this country.  Her parents are from the country of Georgia, which is a Soviet country.

They came here for the American dream; for freedom, for the ability to make money in an honest way. Her father is actually here today.  If he could be recognized.

Her father works for the Federal Government

since he's been in the United States.  Her mother has
her own business.  Her brother has his own business.
They are all honest individuals who make an honest
living and who are very, very hard-working.

She grew up around two parents who worked
all the time.  In fact, she had to put in a substantial
amount of time in raising her brother, who's ten years
her junior, because her parents were working so much all
the time.

She has got great role models in her life,
and her family is taking care of her.  She had admitted
her involvement in this to her family.  And, of course,
they submitted letters to your Honor requesting that
their child not be incarcerated for this.  Her family
loves her very much.

THE COURT:  I have reviewed those letters.

ATTORNEY MEDVIN:  I'm sorry, your Honor?

THE COURT:  I have reviewed those letters.

ATTORNEY MEDVIN:  Thank you, your Honor.

Her family believes that talking to her and
realizing who she is as a person and was a mistake, her
family does not believe that she would ever commit
another such mistake.

My client has been distraught by what has
been going on; by the proceedings, by being

investigated, having to come to court. It is frightening to her. She, at one point, lost a lot of weight. She had a medical condition that was aggravated from this. She has had a variety of physical altercations and conflicts with the other individual involved in this case.

They -- she's in a position where she wants to fix her life and move on, and she has been making accords in her life so that she doesn't have to look back. And so it's something that is in the past, and she's only doing good from here on out.

She's somebody who's caring and loving. She loves her brother very much. She loves her dog very much. She's a good person, your Honor.

She made a mistake here in the course of her business. She also corrected the mistake, and she has tried to disassociate with the individuals who were involved and who were requesting these transcripts.

The purpose for penalizing someone is rehabilitation. That is one of the main purposes of incarceration.

Your Honor, I think the process of going through having to be before the Court and having to be investigated is, in itself, deterrent for my client to ever commit a crime; aside from the crime itself, your

Honor. That, in itself, was a deterrent; having to worry about that.

But having actually to deal with the court system -- and, of course, she will have a felony in her record for the rest of her life, your Honor. That, in itself, is a deterrent. I don't believe that she needs to be rehabilitated above what she's already going through.

And I believe that a period of probation that your Honor would choose for her would be sufficient in making sure that she's not committing any kind of crime so that she is living a clean life.

She has been through a variety of drug tests. She has complied with probation in every which way, all the requests they have made. She has also complied with the agents and the requests they made.

My client is doing everything she can to try and show the Court that she has changed, that this is not something that's going to repeat, and that she feels true remorse for being involved in this.

We're asking the Court to penalize her accordingly with a sentence of probation. We do think that that would be sufficient. There's no violent crime here, your Honor. And my client's involvement here was, in our opinion, minimal.

Additionally, your Honor, the co-defendant, Mr. Khudari, received a sentence.

THE COURT:  Yes, but he had a 5K.

ATTORNEY MEDVIN:  Yes, your Honor, which was 35 percent.

THE COURT:  Yes.

ATTORNEY MEDVIN:  And so he received a sentence of two months of --

THE COURT:  He gave substantial assistance. She wasn't in a position to do that.

ATTORNEY MEDVIN:  She didn't know anything, unfortunately.

THE COURT:  That's not a -- that doesn't -- the fact that she doesn't know enough to cooperate or to provide substantial assistance does not mean that her situation should be compared to Mr. Khudari's.  He was -- you've argued he was more culpable, but the sentence he received does not reflect that greater culpability.  It reflects that plus his substantial assistance.

Go on.  I'm familiar with that.

ATTORNEY MEDVIN:  Yes, your Honor.  Just to bring light on that, the reduction he received was 35 percent.  He served a two-month sentence of incarceration.

If the 35 percent was not granted, that would have only been three months of incarceration.  And so we're only looking at a difference of one month with or without the cooperation.

THE COURT:  What were his guidelines?

ATTORNEY MEDVIN:  His guidelines were above those of Ms. Dzhin.  I believe they were 10 to 16 months.  I don't have the position paper in front of me, but I believe it was around there.

THE COURT:  He received a 5K, didn't he?

ATTORNEY BOGLE:  He did receive a 5K, your Honor, in his guidelines.

THE COURT:  So he never received a sentence based on the guidelines.

ATTORNEY BOGLE:  That is correct.

THE COURT:  So it's not correct to say just three or two months.  He could have received 16 months or he could have received halfway, 10 to 16, and I reduced it from there to three months.

ATTORNEY MEDVIN:  Yes, your Honor.  We're not aware of the exact details.  But nonetheless --

THE COURT:  I was there.

ATTORNEY MEDVIN:  I don't have the details to argue, your Honor.

THE COURT:  No, but let me tell you what the

facts are, and perhaps you'll see something there that you want to bring my attention to.

I don't recall his guidelines, but I think you're correct.

Ms. White, were his guidelines 10 to 16?

THE PROBATION OFFICER:  Yes.

THE COURT:  And he received a Section 5K?

THE PROBATION OFFICER:  Yes.

THE COURT:  5K1.1.

PROBATION OFFICER:  Yes.

THE COURT:  And I granted that and imposed a sentence or him of three months?

PROBATION OFFICER:  Two months' incarceration with four months' community confinement.

THE COURT:  So he really received six months:  Community confinement for four months and jail for two months.

PROBATION OFFICER:  Yes, your Honor.

THE COURT:  And so the situation was that he was facing 10 to 16, and I reduced it to six --

PROBATION OFFICER:  Yes, your Honor.

THE COURT:  -- broken as I've described it.

Those are the facts, Ms. Medvin.

ATTORNEY MEDVIN:  Yes, your Honor.  And as the government points out in their position paper, they

state that while the defendant, too, played an important role in the conspiracy, her conduct was not at the same level as Mr. Khudari, who was the only co-conspirator in a position to produce the fraudulent official university transcripts.

I think it's important to realize that Mr. Khudari is being penalized not just for his role in the conspiracy, but also for his dishonest conduct as someone in a position of power, someone in the position of trust.

My client was not in that position, and she had nothing to do with that. So I think it's important to also realize he's being penalized on a different level than Ms. Dzhin.

THE COURT: Ms. White, did Mr. Khudari get an enhancement for abuse of a position of trust?

PROBATION OFFICER: He didn't, your Honor.

THE COURT: He didn't get that enhancement.

ATTORNEY MEDVIN: In our opinion, it's still something that I'm assuming was argued or considered. His position is nonetheless --

THE COURT: I didn't consider an abuse of trust or I would have imposed a two-level enhancement. But I take your point that he played an important role because he had access to the transcripts and he provided

the false transcripts.

But in no way is it appropriate to argue that because he got two months of confinement and four months of community confinement, that that's comparable to what your client -- more than your client should receive because he received the benefit of a Section 5K1.1.

ATTORNEY MEDVIN:  Yes, your Honor.

THE COURT:  So it would be more appropriate to compare 10 to 16 months to what your client should receive because she's not in a position to receive substantial assistance.

But I take all of your other points that you've made.  You've argued that your client has changed her life and so forth and so on.  I understand all of that.

You've also argued that it wouldn't help her in rehabilitation because she doesn't need it.

I don't think, if you look carefully at 3553, which are the factors for the Court to consider, that you'll find the word "rehabilitation," will you?

ATTORNEY MEDVIN:  No, your Honor.  But, of course, in classic criminal law, that is the --

THE COURT:  Well, we work -- under classic criminal law, we obey statutes.  And it isn't one of the

stated congressional goals for sentencing.  That doesn't mean you shouldn't mention it.

ATTORNEY MEDVIN:  Yes, your Honor.

THE COURT:  It's appropriate for you to bring it to my attention.  But you seem to place emphasis on it that it may not deserve because it's not in 3353(a), which -- and I'll recited those in a few minutes.

ATTORNEY MEDVIN:  I believe that under *Booker*, it gives us the ability to argue the appropriateness of a sentence and the various factors.

THE COURT:  Yes, I say it's appropriate for you to raise it.  But I don't want you under the misimpression that it's a factor under 3553(a).  It is not.

ATTORNEY MEDVIN:  Right, your Honor.  I'm basically arguing the *Booker* case and the relevance of the various circumstances in an individual's life in determining the appropriate sentence for them.

THE COURT:  All right.  That's appropriate.  Anything else?

All right.  I'll hear from the government.

ATTORNEY MEDVIN:  No, your Honor.  Thank you.

THE COURT:  Do you have anything you want to

add to your memorandum?

ATTORNEY BOGLE:  Your Honor, for the reasons set fourth in our memorandum, the government does believe a term of imprisonment is necessary in this matter.  The evidence shows that the defendant knew about the fraudulent conduct.  She did indeed benefit from it and at least on one occasion did direct the creation of a fraudulent transcript.

THE COURT:  What was found on the computer?

ATTORNEY BOGLE:  Your Honor, seven unofficial transcripts were found on her computer.

THE COURT:  Of course, Ms. Medvin has pointed out that that was a joint-use computer that she and Tellawi used together?

ATTORNEY BOGLE:  That is the representations as well as additional witnesses have -- did state that were interviewed that that may have been the case.

THE COURT:  May have been the case.

ATTORNEY BOGLE:  Correct.

Your Honor, in light of the --

THE COURT:  And she's not being -- I take it she was not prosecuted and she didn't plead guilty, although it is, I think, in the statement of facts that she did hire tutors to take exams for people, which is fraudulent conduct.

ATTORNEY BOGLE:  That is correct, your Honor.

THE COURT:  But it isn't what she pled guilty to.

ATTORNEY BOGLE:  No.  It's the government's position that it's relevant to the conduct of what she pled guilty to because her actions and her co-conspirator's actions allowed those individuals to continue the relationship with Integrated Academics as students, and she did benefit financially from that conduct.  However, as the Court correctly pointed out, that is not what she pled guilty to.

THE COURT:  But, as you say, it's related conduct.

ATTORNEY BOGLE:  That is correct, your Honor.  That is our position.

THE COURT:  I wanted to be clear that it's not legal to do that.  I had the impression that maybe the defendant thought that was not illegal conduct, but it's a fraud.

And if they put anything in the mail or used the telephone, it would be a wire fraud or a mail fraud, wouldn't it?

ATTORNEY BOGLE:  That is correct, your Honor.

THE COURT:  Anything further, Ms. Medvin?

ATTORNEY MEDVIN:  We just wanted to make a brief correction to the facts that are being argued.  My client didn't hire those tutors.  Her job was just to manage them.  She didn't actually directly hire any of them.

THE COURT:  All right.  But what did those tutors do?  They took exams for kids, right?

ATTORNEY MEDVIN:  I believe they assisted them with the exams.  I don't know if they actually went in the courtroom and --

THE COURT:  It's in the statement of facts.

ATTORNEY MEDVIN:  Your Honor, if we may confer briefly as to --

ATTORNEY BOGLE:  Your Honor, it's my understanding that there were some online courses that were taken.  And while the tutors likely were not in the actual school taking the exams, that they were taking the online classes and tests on behalf of these students.

THE COURT:  On behalf of the real students.

ATTORNEY BOGLE:  That is correct, your Honor.

THE COURT:  So there was a fraud.

ATTORNEY BOGLE:  I would agree with that

assessment.

THE COURT:  And they used the wires to do it.

ATTORNEY BOGLE:  Yes, your Honor.

THE COURT:  So it would be a federal crime, wouldn't it?

ATTORNEY BOGLE:  It could be, your Honor. It would be.

THE COURT:  What am I missing, Ms. Medvin?

ATTORNEY MEDVIN:  I was just making a correction as to the statement that she hired those individuals that was made, that she did not hire the individuals.  That was all I'm pointing out to the Court, your Honor.

THE COURT:  Well, the heart of the matter is that she, of course, knew that they were engaged in criminal conduct.

All right.  Any reason why the Court should not now impose sentence?

ATTORNEY BOGLE:  Not from the government, your Honor.

ATTORNEY MEDVIN:  No.

THE COURT:  All right.  Come to the podium, Ms. Dzhin.

First I'm going to rule on the outstanding

issue, which is whether this defendant is entitled to a two-level credit for a minor role adjustment under 3B1.2.

I've known, of course, about the objection for some time, and I've considered it. And I alluded at the outset to the problem of this being a small conspiracy. And the statute -- the guidelines make quite clear under 3B1.2 that a minor role adjustment should apply only if someone is substantially less culpable than the average participant.

But when you have a small conspiracy of three persons, clearly one of the persons is the most culpable, Mr. Tellawi. And his sentence hasn't occurred yet, but I am confident that he will receive a role adjustment to reflect that.

And has his PSR been issued yet, Ms. White?

PROBATION OFFICER: Your Honor, the final presentence report has not been issued because the sentence has been continued.

THE COURT: Now -- so it makes it difficult when it's small. In the end, what I concluded and after hearing what I've heard today, I don't think that this defendant played a minor role.

I have a difficult time applying the standard because the average participant -- there are

only three people.  Was she less culpable than
Mr. Tellawi?  Yes.  Was she less culpable than
Mr. Khudari?  Well, I don't know about less culpable,
but she certainly did less.

In the end, it doesn't matter.  I will
impose the same sentence whether I give her the
two-level credit or not.

For the record, she will receive the
two-level credit, although I do that only for record
purposes and because the government agreed to it in the
plea agreement.  And I'm reluctant to deprive a
defendant of that.  Although when I went through the
plea agreement with the defendant, I clearly told her
that I wasn't bound by that and that I could reach a
different result.

In the end, it turns out that it's not a
material factor to me.  I'm clear on her role, I'm clear
on the roles of the others, and it will not be material.
So her guidelines, however, will be 6 to 12 months
because I will give her the credit for the -- for the
two-level reduction.

Now, in imposing an appropriate sentence,
the law requires that the Court consider a variety of
factors under 3553.  First, the Court is required to
take into account the defendant's personal history and

characteristic which have been fully set forth for me in the presentence report and which Ms. Medvin has amplified and elucidated in her brief and in her remarks today. And I'm am familiar with all of that. And I've taken into account the letters that were submitted, and I'll order that they be made a part of the presentence report.

The nature and circumstances of the offense need to be taken into account and I have taken into account. It is a serious offense, a very serious offense.

There is also the important factor of adequate deterrence; not only to deter this defendant, but to serve as general deterrence; that is, the sentence I impose should stand as a beacon, as a warning to others not to engage in this conduct and to protect the public.

Both of those -- I don't think there's a need to deter Ms. Dzhin further. I think Ms. Medvin is correct that she will be deterred already by what she has gone through. And I don't think the public requires protection, but I do think that the sentence needs to reflect general deterrence, that this is not conduct that can be tolerated and that goes without punishment.

Next, the law requires that I consider the

kinds of sentences available.  It requires that I

consider the guidelines.  The guidelines are 6 to

12 months.  They're not binding on the Court.  I

don't -- I'm not bound by them.  I could reach a

different result.

And the law also requires that I consider

what the parties have argued.  Ms. Medvin argues that a

sentence of probation would be sufficient but not

greater than necessary, using the parsimony principle.

In the end, I don't agree with that.  They

are no free passes.  Decisions to engage in criminal

conduct always have consequences.

But I do agree, Ms. Medvin, that she doesn't

need to be deterred.  There needs to be general

deterrence and there needs to be just punishment for the

offense.  And it is the judgment of this Court -- and in

the end, all sentences are judgments.  They're judgments

first by Congress in setting the limits as to what

punishment can be imposed.  They're judgments by the

Sentencing Commission with respect to the guideline

ranges.  Those are judgments.

And in the end, what the sentencing judge

does is a judgment.  It's not a mathematical exercise.

And in the end, it is the judgment of this Court that --

Ms. Dzhin, that you be committed to the custody of the

Bureau of Prisons for 60 days.

And upon release from confinement, you'll serve three years of supervised release.  As a special condition of that supervised release, I want you to perform -- I think 30 hours of community service would be sufficient, but I want that community service to be provided in a way that will enhance the deterrence that others might feel; that is, I want it to be in the form of talks or lectures that you give to groups about immigration fraud and the consequences of immigration fraud.

Ms. White, I leave to the Probation Office and Ms. Dzhin to work together to come up with appropriate venues and opportunities for that sort of discussion.  Because I think -- I think, Ms. Dzhin, your statement of contrition is genuine.  I think you genuinely regret what you did.  And I think you understand, at least I hope you do, that it has nothing to do with whether it helped or hurt the business.  It had to do whether it was right or wrong.

And if you've made the decision, as I hope and you say you have done, that you want to be an honest person, then you've made a giant leap forward in your life, and you can tell others about that.

You're to pay a hundred dollar special

assessment.

There's a forfeiture in this case.

Do you have the forfeiture order?

ATTORNEY BOGLE:  I do, your Honor.

THE COURT:  I'm not going to impose a punitive fine in view of the forfeiture order.

What is the -- Ms. White, you recommended a fine, did you not?

PROBATION OFFICER:  Your Honor, based on the financial information that we were provided, it appears there were assets to pay a fine.

THE COURT:  All right.  Let me see the forfeiture order.  I reviewed it once before.

This is in the plea agreement as well; is that right?

ATTORNEY MEDVIN:  Yes, your Honor.

THE COURT:  All right.  This calls for a forfeiture of $265,000 because that reflects the overall fraud; is that right?

ATTORNEY BOGLE:  That is correct, your Honor.

THE COURT:  And there was $48,000 that was seized from Tellawi on January 25th and a $40,000 check issued for funds drawn from Integrated Academic Citibank checking account and a Mercedes -- 2010 Mercedes seized.

Was that seized -- was that in the name of Tellawi or the defendant?

ATTORNEY BOGLE:  It's actually in the name of the defendant's brother.  Tellawi was in possession of the vehicle.

THE COURT:  All right.  But that, nonetheless, is part of the forfeiture.

ATTORNEY BOGLE:  That is correct, your Honor.

THE COURT:  What's the government's position a punitive fine apart from the forfeiture?

ATTORNEY BOGLE:  Your Honor, as stated in our position paper, we do think a fine is appropriate here, and we defer to the Court as to the amount.

THE COURT:  What's the fine guideline range?

The fine guideline range is 3,000 to 30,000, is it not?

ATTORNEY BOGLE:  It is, your Honor.

THE COURT:  All right.  And Ms. White, you've determined that the resources exist for that.

PROBATION OFFICER:  There is a positive monthly cash flow.  And based on that information, we felt that a minimum --

THE COURT:  I will impose a $1,000 punitive fine.  All of that is due and payable immediately.

Have I omitted anything in the sentence?

ATTORNEY BOGLE:  No, your Honor.

THE COURT:  Anything further to be --

Ms. White?

PROBATION OFFICER:  We recommended some additional conditions.

THE COURT:  Yes, you did.  Let me see.  Let me review that here.

Yes, a special condition that she participate in a program approved by the Probation Office for substance abuse; that is, that you participate in and successfully complete a program for substance abuse at the direction and discretion of the Probation Office; that you provide the probation officer with access to any requested information; and that before you incur any new credit charges or open additional lines of credit, you must seek the approval of the Probation Office.

And are you currently employed, Ms. Dzhin?

THE DEFENDANT:  Yes, I am.

THE COURT:  With Integrated --

THE DEFENDANT:  Yes.

THE COURT:  It's still that company?

THE DEFENDANT:  Yes, I am.

THE COURT:  All right.  That's perfectly all

right.  There's nothing wrong with that.

If you do seek -- during your period of supervised release, if you do seek other employment, you have to advise your -- the person from whom you're seeking the employment that you have this conviction.

THE DEFENDANT:  Uhm-hmm.

THE COURT:  And the fine that I've imposed is due and payable immediately.  If not paid immediately, then you're to begin paying it at the rate of $150 a month beginning 60 days after your release from confinement.

Anything further in this matter today?

And that's the same sentence I would impose whether or not I had granted the two-level enhancement. And I'll note that that sentence is below the sentence that the government recommended.

Anything further in this matter today on behalf of the government?

ATTORNEY BOGLE:  No, your Honor.

THE COURT:  On behalf of the defendant?

ATTORNEY MEDVIN:  No, your Honor, other than one last request.  If the 60 days could be served as in-home incarceration.

THE COURT:  No.  Home incarceration is not punishment.  I'm reminded of Martha Stewart getting home

incarceration in a 10,000-square-foot home with a swimming pool and so forth.  It isn't punishment.  Even being in a small home with a beet and a clicker is not punishment.  Jail is punishment.  Home confinement is not.  I've imposed it rarely in the last nearly 30 years, 28.  Generally, there are medical reasons for it.

        Anything further, Ms. Medvin?

        ATTORNEY MEDVIN:  No, your Honor.  Thank you.

        THE COURT:  All right.  I thank counsel for your cooperation.

        ---

CERTIFICATE


I, MICHAEL A. RODRIQUEZ, an Official Court
Reporter for the United States District Court, in the
Eastern District of Virginia, Alexandria Division, do
hereby certify that I reported by machine shorthand, in
my official capacity, the proceedings had upon the
sentencing hearing in the case of UNITED STATES OF
AMERICA v. LEA DZHIN.


I further certify that I was authorized and
did report by stenotype the proceedings in said
sentencing hearing, and that the foregoing pages,
numbered 1 to 47, inclusive, constitute the official
transcript of said proceedings as taken from my machine
shorthand notes.


IN WITNESS WHEREOF, I have hereto subscribed
my name this  18th   day of  August         , 2014.


                                        /S/
                        _____
                        Michael A. Rodriquez, RPR/CM/RMR
                             Official Court Reporter